UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **United States of America,** | Civil No. 06-CV-2205 (JNE/SRN) |
| Petitioner, | |
| v. | REPORT AND RECOMMENDATION |
| **Rayford Knight,** | |
| Respondent. | |

Perry F. Sekus, Esq., on behalf of Petitioner

Lyonel Norris, Esq., on behalf of Respondent

SUSAN RICHARD NELSON, United States Magistrate Judge

The above entitled matter comes before the undersigned United States Magistrate Judge on the Government's Petition to Determine the Present Mental Condition of an Imprisoned Person Under 18 U.S.C. § 4245 (Doc. No. 1). This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

For the reasons set forth below, the testimony and exhibits presented at the hearing on this matter, and all other records herein, this Court recommends that the Government's petition be granted.

A hearing on this matter was held on July 13, 2006, wherein Dr. Daniel Lewis, Respondent's treating psychiatrist, testified. Respondent attended and testified at the hearing as well.

**I.    BACKGROUND**

Respondent, a 73-year-old male, is currently serving a 292-month sentence for conspiracy to distribute and possession with intent to distribute cocaine. His projected release date is December 16,

2014. He was transferred to the Federal Medical Center (FMC), Rochester, Minnesota, from the Federal Correctional Institution (FCI), Allenwood, Pennsylvania, on February 16, 2006 for a mental health evaluation and treatment for symptoms of psychosis. (Mental Health Eval. at 1, Govt. Ex. 11.)

Respondent, who is a Cherokee Indian, grew up in South Carolina and Brooklyn, New York. He has been in several relationships during his life and has one adult son and a stepdaughter. He worked as a welder and later operated his own trucking business for many years. (Initial Psych. Eval. at 4, Govt. Ex. 2.) He claims to be a devout practitioner of Red Rose, a Native American religious faith. Id.

During the course of his current sentence, Respondent has been incarcerated in various federal correctional institutions. The Court will confine its recitation of facts to the facilities wherein Respondent's mental health was at issue. While incarcerated at FCI Ft. Dix, New Jersey, Respondent was seen by a psychologist on April 26, 2000, the day after his arrival from FCI Butner. (Initial Psych. Eval. at 1, Govt. Ex. 2.) His mood was somewhat depressed, his speech rambled and he did not sleep. He stated that he was on a mission to spread "the word of the universe." Id. The interviewing psychologist observed paranoid ideation, delusions, disorganized speech, labile affect, loose associations, impaired attention and concentration and a depressed mood. He refused food at times, claiming it was poisoned. Shortly thereafter, psychology staff believed that Respondent was suffering from disorganized schizophrenia. Per his treatment plan, Respondent was to be offered psychotropic medications and supportive counseling and was to be transferred to a medical center. Id. at 1-2.

On June 1, 2000, a psychologist conducting an interview of inmates in the Special Housing Unit (SHU), where Respondent was housed, wrote that although Respondent presented with psychotic

symptoms, he was adjusting to SHU. He was eating, recreating and not creating any problems for staff. He engaged in loud prayer sessions, but was otherwise cooperative and content. Id. at 2.

Respondent arrived at FMC Rochester on July 18, 2000. He denied any history of psychiatric illness, depression, suicidal ideation, or excessive worries or anxiety. He also denied any history of auditory or visual hallucinations, or a belief that others could control his mind. He stated that he had never been violent toward others. Id. The evaluation indicates that Respondent suffered two heart attacks previously, in 1993 and 1994. In addition, it notes that Respondent had a history of poor compliance with medical treatment for these conditions. Id. The diagnostic impression of the reviewing psychiatrist, Dr. Olnes, was that Respondent suffered from psychotic disorder, in remission. Id. at 6. Dr. Olnes noted that Respondent was not manifesting any overt signs of mental illness. He suggested that he be monitored and offered treatment with psychotropic medication, if warranted. Id.

On August 30, 2000, Dr. Olnes recommended that Respondent be transferred to a regular institution commensurate with his custody/security level. (Transfer Eval. at 4, Govt. Ex. 3.) A week or two after his arrival at FMC Rochester, Respondent underwent a complete psychiatric evaluation. A period of observation revealed no evidence of mental illness and staff determined that pharmacotherapy was neither warranted nor offered. Id. Dr. Olnes diagnosed brief psychotic disorder, in full remission. Id.

Respondent arrived at FCI Ft. Dix on October 12, 2000. (Case Summary at 1, Govt. Ex. 4.) Staff observed that Respondent was polite and spent much of his time around a tree where he would smoke a religious pipe and perform religious rituals. He was referred to psychology staff a number of time because of "bizarre behaviors." On July 10, 2003, staff psychiatrist Gary Riggs noted that

3

Respondent had an apparent relapse into psychosis. He told a staff member that he planned to fire a lieutenant and demanded release, or threatened to blow up the facility. Id. He also demanded a big truck containing $10,000. He also purportedly turned in a "hit list" of staff members. Id. He claimed to be President of the United States and a doctor who heals using his body, having no need for medication. He further claimed to be the "great spirit of the buffalo," and stated that the Great Spirit would kill anyone who tried to handcuff him. His appearance was disheveled, he reported not sleeping at night, and his behavior and mental status had deteriorated. He was considered a risk for harm to others and possible risk for self-harm. As a result, he was transferred to FMC Devens on an emergency basis. Id.

On arrival at FMC Devens in July 2003, Respondent said that he was a "medicine man, very spiritual and not violent." He reported that he had very strong power from his "grandfather," and that if he did not do what his "grandfather" asked, the "grandfather" would kill him. In mid-September 2003, Respondent stated that he was bigger than the Pope in the Indian community, could communicate with animals and believed that his radio was bugged. Later that month, Respondent appeared angry, paranoid, grandiose and his thought process was disordered. Id. He was verbally aggressive toward his treating psychiatrist. Respondent believed that staff wanted to kill him with medication. He refused to take blood pressure medication, claiming that he could heal himself. Staff psychiatrist Dr. Riggs diagnosed Respondent with paranoid schizophrenia and recommended that he be considered for hospitalization pursuant to 18 U.S.C. § 4245.

A six-month review of Respondent's treatment at FMC Devens, dated February 5, 2004, showed that Respondent continued to refuse medication, remained psychotic and had deteriorated in

his mental status. (FMC Devens Evaluation/Treatment/Management Plan, Govt. Ex. 5.) In April 2004, however, Dr. Riggs evaluated Respondent's condition as stable and recommended that he be transferred back to FCI Ft. Dix. (Psychiatric Unit Transfer Summary, Govt. Ex. 6. at 4.) While Respondent was diagnosed with schizophrenia, residual type, he exhibited no signs of thought disorder, apparent paranoia or behavioral problems. Id. at 3. He did continue to express strong religious beliefs, with some delusional ideation and grandiosity. He took his medication for his medical problems on a regular basis. Id.

Respondent was later transferred to FCI Loretto and participated in an intake follow-up on July 16, 2004, after staff complained of his lack of compliance with medical recommendations. (Mental Health Eval., Govt. Ex. 11 at 5.) On September 24, 2004, a risk assessment was completed following complaints from staff members about Respondent's demonstrative and elaborate prayer sessions, his lack of sleep and his perception that he was being deprived of his religious rights. He was described as exhibiting poor hygiene and racing thoughts. Id. On October 8, 2004, Respondent approached a female officer, telling her he would marry her and have children. He said that he had six million dollars and eight wives. Id. When approached by other staff about this behavior, Respondent became defensive, claimed to only be joking and agreed to not engage in such behavior again. Id.

In May 2005, Respondent was placed in SHU for "aggressive encounters on the compound," although no specifics were offered. Id. Respondent reported having endured multiple beatings by staff, but did not seek medical treatment because of his belief that the Great Spirit heals him. A psychologist interviewing him at this time indicated that there was no evidence of psychosis, but believed there might be a manipulative component to Respondent's reported mental health symptomology. Id.

On January 25, 2006, psychology staff at FCI Allenwood initiated an emergency transfer to a medical center. On that date, Respondent was carried to SHU, as he refused to move. In SHU, he broke free from his handcuffs and threatened to use them to harm staff. He advised women to leave SHU, as he was "going to kill them all." Id. Respondent received emergency medication. Id. at 6.

Respondent arrived at FMC Rochester on February 16, 2006. He displayed a cooperative attitude, but his thought content was delusional and he acknowledged hearing the voice of the Great Spirit. Id. He was not taking any medication at the time of his admission. On February 21, 2006, Respondent was observed sitting in a telephone room, staring off into space. When he was approached, he instructed nursing staff to address him as "chief," or "spirit," and then reported that he was communicating with the spirits, stating, "I rule the world from right here." Id.

On March 3, 2006, Respondent informed nursing staff that while at his previous institution, staff had given him an injection to kill him in order to obtain his money. Id. He stated that this had happened to him six times and each time he had sued the BOP and received 1.1 million dollars, for a total of 6.6. million dollars.

Respondent met with his treating psychiatrist on March 6, 2006, at which time he indicated that he had been communicating with the Great Spirit. He refused psychotropic medications, stating that he was not mentally ill. On March 8, 2006, he told nursing staff that black wolves came to him and licked him when he felt unwell. He also stated that he could not be killed even though the BOP had tried to do so on many occasions. Id.

In April 2006, Respondent again denied that he was mentally ill and did not need to participate in any groups. He stated that the information in his records reporting that he was mentally ill was "all

6

lies." Id. at 7. He reported that he had been kidnaped by the BOP and held for the past 15 years without a charge.

Records indicated that Respondent was awake all night on April 21, 2006. He was confronted by staff about unauthorized "gear," namely, a feather in his hair. He refused to remove it and it was confiscated. He later stated that he felt disrespected by staff and that birds had given him the feather. He stated that he was the owner of the government. Id. He later approached the nurses' station with an armful of institutional clothing, stating that he did not want it. He was noted to be awake the whole night and was observed sitting in the telephone room singing. Id. When approached by nursing staff, he shook his finger at a nurse, then demonstrated a "hurricane dance." He loudly stated that white people had raped and killed Indian women, but had not buried them deep enough. Id. Shortly thereafter, Respondent was placed in SHU, where he received emergency medications. He reported to his psychiatrist that he intended to sue him due to receiving involuntary medication. He also reported having sustained broken ribs and an injured kidney due to falling against the wall during the emergency medication procedure. A Physician's Assistant found no evidence consistent with Respondent's allegations of harm. Id. at 8.

On May 1, 2006, Respondent reported to his psychologist that he did not know why he had been placed in SHU or given emergency medications, other than because the staff was "crazy." Respondent wore a blanket and towel draped around himself, stating that it was a prayer shawl. He indicated that although he was a member of the Cherokee nation, that he was also a rabbi. He again refused psychotropic medications and denied mental illness. Id. He was returned to the open population of the mental health unit after assuring staff that he would follow their directives if his

behavior disturbed others.  Id.

On May 4, 2006, Respondent was awake the entire night.  He told staff that the mob had a hit out on him.  The following day he reported the inability to sleep for approximately ten days, stating that he was kept awake by spirits living inside of him.  He showed staff several photographs taken at previous institutions.  There was a light in many of the pictures that appeared to be the reflection of the camera's flash in the window.  Respondent insisted that it was the Great Spirit and proved that a spirit lived within him.  He also showed photographs of himself in which his shadow was visible.  He denied it was his shadow, but instead stated that it was the black wolf who visits him when he is sick.  Id.

Respondent's diagnosis was paranoid schizophrenia.  Staff opined that appropriate medical treatment for Respondent's mental health was indicated for several reasons.  Id. at 10.  First, it would hopefully help Respondent develop insight regarding his need for care and enable him to enjoy a higher level of functioning; second, he would be less likely to require SHU placement; and third, he would be an appropriate candidate for placement at the Step-Down program at FCI Butner.  In the opinion of FMC Rochester psychologists and psychiatrists, Respondent is presently unable to function in a mainstream institution and has required emergency medication to function.  Accordingly, it is their opinion that Mr. Knight is suffering from a mental disease or defect for which he needs custody or care from a suitable facility.  Id. at 11.     Dr. Lewis, Respondent's treating psychiatrist at FMC Rochester, also testified regarding Respondent's medical history.  Dr. Lewis testified that although it was not typical for a person to be diagnosed with schizophrenia later in life, it can happen and may have simply gone undiagnosed previously.  Dr. Lewis described Respondent as moderately mentally ill.  Based on Dr. Lewis's experience and training, to a reasonable degree of medical certainly, he believes

8

that Respondent currently suffers from the mental disease of paranoid schizophrenia – a diagnosis in which his colleagues concur. He noted that Respondent experiences delusions. Dr. Lewis believes that Respondent poses a threat to himself or others in that he has acted aggressively at times with staff members and inmates during periods of mental health decompensation. He suffers from sleep and appetite loss and his speech becomes disorganized. At times, Respondent takes medications for his heart problems, but at other times, he refuses such medications.

In Dr. Lewis's opinion, at this time, Respondent is not able to adequately function in the general population. He expressed the belief that because Respondent's condition fluctuates, if untreated, Respondent will continue to have episodes of confusion that will worsen over time and occasionally require emergency medication. Medically, with his failure to accept medication for hypertension and coronary heart disease, Respondent is at risk for further heart attacks and strokes, in Dr. Lewis's opinion.

On the other hand, Dr. Lewis believes that if Respondent receives treatment, his symptoms will likely go into remission. Dr. Lewis stated that treatment would allow Respondent to develop insight into his condition, would make it more likely for him to remain on the open compound and to participate in treatment programs and release preparation programs. Dr. Lewis stated that, in his opinion, Respondent would not be appropriately treated in a normal prison setting. Instead, he opined that Respondent requires a range of medical and therapeutic treatments which are available at FMC Rochester.

On cross-examination, Dr. Lewis conceded that he was not aware that certain Native American religions believe there is no difference between animals, people, the spirit world and the

9

natural world.  He agreed that a person ensconced in such a belief system, who communicated with animals and natural objects, might not necessarily be delusional.  He testified that he was aware that in the Cherokee tribe, there is a concept of a guardian spirit with whom one speaks on a regular basis.  Dr. Lewis explained that while a hypothetical person engaging in such communication might not be delusional, one would expect such a person to then engage in this behavior consistently.  In Dr. Lewis's observations, Respondent has not engaged in this behavior when he was not mentally ill, therefore, he believes that Respondent's actions are indicative of mental illness, rather than an expression of Native American religious belief.

Dr. Lewis testified that Respondent's belief in self-healing is indicative of bizarre delusional behavior, but conceded that a Christian Scientist practicing such self-healing would not be engaging in bizarre delusional behavior.  Dr. Lewis again reasoned that when Respondent is not mentally ill, he does not have the same Great Spirit conversations, nor does he talk to birds and trees.

Dr. Lewis further stated that in the absence of mental illness, he believed that Respondent would be free to refuse his heart medications, if he signed a refusal.  He further indicated that Respondent was generally cooperative, friendly and clean and he placed him at a 50-60 Global Assessment Range, meaning that he has the ability to function fairly well in activities of daily living.

Respondent also testified at the hearing.  He stated that he did not believe that he was mentally ill, but instead, he dealt with his problems through the Great Spirit.  He testified that he speaks with the Great Spirit all day and night and never stops talking to him.  The Great Spirit has told him that he is the President of the United States and Mexico.  Respondent stated that he could heal himself and others of any kind of disease and that he does it all the time through the Great Spirit.  He stated the he uses

feathers, sage and garlic as a form of medicine in his belief system. In addition, he testified that the Great Spirit sends a wolf to him when he is sick. The wolf licks him and he gets better. Respondent testified that he takes no medicine, never has and any records to the contrary are simply lies. He testified that Dr. Lewis's testimony was a lie, but he could not explain why.

Respondent testified that he was kidnaped by a drug enforcement agent and wrongly convicted. In addition, he stated that in 2001, the Great Spirit sent a black pick-up containing a 101 million dollar check to him in prison for his return home that day. Respondent believes that the warden and prison workers at FMC Devens took the money, put it in the bank and assaulted him. He testified that at FMC Rochester, Dr. Lewis sent a "goon squad" to him in the hole. He alleges that he was beaten and injected with medicine.

## II. DISCUSSION

Under 18 U.S.C. § 4245, a prisoner who is serving a sentence in federal prison "may not be transferred to a mental hospital without the prisoner's consent or a court order." United States v. Watson, 893 F.2d 970, 975 (8th Cir. 1990), vacated in part on other grounds by United States v. Holmes, 900 F.2d 1322 (8th Cir. 1990). If the prisoner objects, the government may petition for a hearing on the present mental condition of the prisoner to determine "if there is reasonable cause to believe that the person may presently be suffering from a mental disease or defect for treatment of which he is in need of custody for care or treatment in a suitable facility." 18 U.S.C. § 4245(a). "If, after the hearing, the court finds by a preponderance of the evidence that the person is presently suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility, the court shall commit the person to the custody of the Attorney

General." Id. at § 4245(d).

Accordingly, this Court is required to determine the following: (1) whether Respondent is suffering from a mental disease or defect; (2) if so, whether Respondent is in need of care or treatment for that disease or defect; and (3) if so, whether FMC Rochester is a suitable facility.

### A.     Respondent is Suffering from a Mental Disease or Defect

At the hearing on this matter, Dr. Lewis testified that Respondent suffers from schizophrenia, paranoid type.[1]  Dr. Lewis testified that his diagnosis is in accord with that of his colleagues and is supported by his review of the medical records, his own evaluations and observations.  Dr. Lewis testified that Respondent's manifestation of delusions and occasional aggression support his diagnosis of paranoid schizophrenia.

 While certain testimony concerned whether Respondent's Native American spiritual expression was misconstrued as mental illness, Dr. Lewis emphasized that if Respondent's actions were simply a reflection of his spirituality, he would expect to see Respondent engage in such actions when he was not exhibiting mental illness.  This was not the case, according to Dr. Lewis.

Much of the evidence is devoid of any connection to Native American spiritual belief, however, and that evidence sufficiently demonstrates that Respondent suffers from mental illness.  For example, evidence in the record indicates that Respondent once told prison staff that he planned to fire a lieutenant, blow up the prison facility and demanded a big truck containing $10,000.  He purportedly

---

[1] Respondent voiced no objections to the admission of Dr. Lewis's curriculum vitae, Govt. Ex. 1, which sets forth Dr. Lewis's education, experience and qualifications to offer an expert medical opinion.

turned in a hit list of staff members and claimed to be the President of the United States and Mexico. He believed that his radio was bugged. He believed that medical staff wanted to kill him with medication and that he had been assaulted by staff when no medical evidence supported such allegations. He has claimed to have six million dollars from lawsuits against the BOP and eight wives. He has expressed the belief that he rules the world. He claims to have never taken medication when medical records and the testimony of Dr. Lewis indicate the contrary.

Dr. Lewis's expert opinion is credible and persuasive, and along with the medical record and Respondent's own testimony, the Court finds that by a preponderance of the evidence, Respondent is suffering from a mental disease or defect.

### B.    Respondent is in Need of Custody for Care and Treatment

The standard for when a prisoner is "in need of custody for care or treatment" under 18 U.S.C. § 4245(d) has not been firmly established. One district court has explained that there is a continuum of "need" between treatment that is merely beneficial and treatment that is necessary to combat dangerous behavior. United States v. Horne, 955 F.Supp. 1141, 1146-47 (D. Minn. 1997). It is clear, however, that "if a prisoner whose mental illness was left untreated would pose a danger to himself or others if placed in the general prison population, . . . treatment is needed within the meaning of 18 U.S.C. § 4245." Id. at 1149.

Here, Respondent is in need of custody for care or treatment because without it he poses a danger to himself and to others. Although Respondent is generally agreeable and cooperative, the record reflects that at times of mental health decompensation, he has displayed aggressive and threatening behavior. At various times, he has threatened to harm staff and engaged in non-compliant

13

behavior. In Dr. Lewis's medical opinion, Respondent's mental illness interferes with his ability to accept treatment for his physical ailments, therefore, he poses a danger to himself without mental health treatment. Without such treatment, Dr. Lewis opined that Respondent will continue to have periods of confusion that will worsen over time and require emergency treatment. Because of his failure to accept medication for hypertension and coronary heart disease, Respondent is at risk for further heart attacks and strokes, according to Dr. Lewis.

In contrast, with appropriate treatment, Dr. Lewis opined that Respondent's prognosis for showing improvement is good. With treatment including psychiatric medications and group therapy, Dr. Lewis would expect Respondent's schizophrenia to go into remission. As a result, Respondent would likely be able to live in a less restrictive housing unit and to participate in various treatment and release preparation programs.

Dr. Lewis testified that, in his opinion, Respondent needs psychological and psychiatric treatment pursuant to 18 U.S.C. § 4245. As to Respondent's placement, Dr. Lewis testified that Respondent is in need of care and treatment available at FMC Rochester. Dr. Lewis testified that FMC Rochester is the appropriate facility to treat Respondent's mental illness, in light of its medical staff, therapeutic environment and support groups.

A preponderance of the evidence demonstrates that Respondent's mental disease or defect poses a danger to himself and others. Without treatment, Respondent likely will experience no improvement of his schizophrenia and his symptoms will likely require emergency medication. In addition, his occasionally aggressive behavior could pose a harm to others. Moreover, Respondent's mental illness has interfered with his acceptance of medication for his heart condition, which poses a

grave risk to himself.

### C. FMC Rochester is a Suitable Facility

Respondent appears to concede that FMC Rochester is a suitable facility for care or treatment, and this Court finds entirely persuasive the evidence presented that FMC Rochester is a suitable facility to provide Respondent with necessary medical and therapeutic treatment.

Based upon the foregoing and all the files, records, and proceedings herein,

Therefore, **IT IS HEREBY RECOMMENDED THAT**:

1. The Government's Petition to Determine Present Mental Condition of an Imprisoned Person Under 18 U.S.C. § 4245 (Doc. No. 1) be **GRANTED**. Respondent is in need of custody for care or treatment of a mental disease and/or defect; and

2. Respondent should be committed to the custody of the Attorney General of the United States pursuant to 18 U.S.C. § 4245 for hospitalization and treatment, preferably at FMC Rochester, until the Respondent is no longer in need of such custody for care and treatment, or until the expiration of the sentence of imprisonment, whichever occurs earlier.

Dated: July 31, 2006

                                      <u>s/Susan Richard Nelson</u>
                                      SUSAN RICHARD NELSON
                                      United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by August 16, 2006, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. All briefs filed under this rule shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made.